UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | |
| KENNETH BOWEN<br>ROBERT GISEVIUS<br>ROBERT FAULCON<br>ANTHONY VILLAVASO<br>ARTHUR KAUFMAN | NO. 10-204 |
| GERARD DUGUE | SECTION "N" (1) |

## **ORDER AND REASONS**

Before the Court is the "Motion to Change Venue and for Evidentiary Hearing" (Rec. Doc. No. 338), filed on behalf of all defendants. This motion is opposed (Rec. Doc. No. 350). Based upon communications with all counsel, it was determined that an evidentiary hearing is not required. Defendants were allowed until Wednesday, May 18, 2011, however, to submit additional evidence in support of their motion (Rec. Doc. No. 369).

In their motion, the defendants assert that a change of venue for trial of this matter is appropriate because a "community animus towards the Defendants and the New Orleans Police Department ("NOPD") generally has so infected the New Orleans Metropolitan Area that Defendants cannot receive a fair trial in the greater New Orleans region." The defendants'

1

supporting memorandum sets forth the history of this case, describing particularly the media attention corresponding to each of the events leading up to this trial, *i.e.,* the state case, the entry of federal guilty pleas by others[1] based upon related facts, and the trials of other members of the NOPD in matters entirely unrelated to this one. Defendants then attempt to distinguish the United States Supreme Court's recent decision in *Skilling v. United States,* 130 S.Ct. 2896 (2010), and argue that this matter is more akin to the Supreme Court's treatment of the change-of-venue issue raised in *Rideau v. Louisiana,* 373 U.S. 723 (1963). For its part, the government asserts that even widespread publicity is not sufficient to warrant a change of venue, and that the publicity surrounding the September 4, 2005 events and subsequent legal proceedings has been, for the most part, neutral and balanced, including statements made by defense counsel as part of such coverage. The government maintains that, through proper jury voir dire, an impartial and unbiased jury can be seated to hear this matter in the Eastern District of Louisiana.

## **LAW AND ANALYSIS**

In *Skilling,* the Supreme Court stated:

> The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury. By constitutional design, that trial occurs "in the State where the ... Crimes ... have been committed." Art. III, § 2, cl. 3. See also Amdt. 6 (right to trial by "jury of the State and district wherein the crime shall have been committed"). The Constitution's place-of-trial prescriptions, however, do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial — a "basic requirement of due process," *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955).FN 11

---

[1] Michael Lohman, Jeffrey Lehrman, Michael Hunter, Robert Barrios and Ignatius Hills, in succession, entered guilty pleas arising out of some aspect of the allegations in this case. None are indicted as co-defendants in this case.

> FN11.  Venue transfer in federal court is governed by Federal Rule of Criminal Procedure 21, which instructs that a "court must transfer the proceeding ... to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."  As the language of the Rule suggests, district-court calls on the necessity of transfer are granted a healthy measure of appellate-court respect.  See *Platt v. Minnesota Mining & Mfg. Co.,* 376 U.S. 240, 245, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964).  Federal courts have invoked the Rule to move certain highly charged cases, for example, the prosecution arising from the bombing of the Alfred P. Murrah Federal Office Building in Oklahoma City.  See *United States v. McVeigh,* 918 F.Supp. 1467, 1474 (W.D.Okla.1996).  They have also exercised discretion to deny venue-transfer requests in cases involving substantial pretrial publicity and community impact, for example, the prosecutions resulting from the 1993 World Trade Center bombing, see *United States v. Salameh,* No. S5 93 Cr. 0180(KTD) (SDNY, Sept. 15, 1993); *United States v. Yousef,* No. S12 93 Cr. 180(KTD) (SDNY, July 18, 1997), aff'd 327 F.3d 56, 155 (C.A.2 2003), and the prosecution of John Walker Lindh, referred to in the press as the American Taliban, see *United States v. Lindh,* 212 F.Supp.2d 541, 549-551 (E.D.Va.2002).  Skilling does not argue, distinct from his due process challenge, that the District Court abused its discretion under Rule 21 by declining to move his trial.  We therefore review the District Court's venue-transfer decision only for compliance with the Constitution.

"The theory of our [trial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."  *Patterson v. Colorado ex rel. Attorney General of Colo.,* 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907).

*Skilling*, at 2912-13.  *See also, United States v. Whitmore,* No. 09-60400, 386 Fed. Appx. 464, 2010 W.L. 2802393 (5th Cir. 2010); *United States v. Mitchell,* 484 F.3d 762 (5th Cir. 2007).  In *Skilling,* the Court highlighted four factors supporting its decision: (1) the size and characteristics of the community in which the alleged crime occurred; (2) the nature of the news stories regarding the

defendant and the crime, *i.e.,* whether such coverage was so blatantly prejudicial or contained other compromising information such as an improper/disavowed confession of the defendant; (3) the length of time between the alleged crime and the trial itself, and (4) the jury's ultimate treatment of the defendant at trial, *i.e.,* the jury's consideration of each count in determining guilt or innocence.[2] *Skilling,* at 2915-16.

Under the *Skilling* guidelines, the Court is unconvinced that, with the benefit of the completed potential juror questionnaires,[3] along with extensive group and individual voir dire of the members of the jury pool, a fair and impartial jury cannot be selected. Initially, the Court notes that, contrary to defendants' assertions, the jury pool is not limited to the "greater New Orleans Metropolitan Area." Rather, the jury members who will be chosen to sit for this trial will be selected from thirteen diverse parishes across southeastern Louisiana, from areas as far away as Amite, Bogalusa, Hammond, Slidell, Chalmette, Point-a-la-Hache and the Houma/Thibodaux area, that constitute the Eastern District of Louisiana. Those areas, and others similar, are outside of the scope of metropolitan New Orleans, and, for the most part, have either their own newspapers and/or local electronic media, or lie within the broadcasting area of other localities, such as Baton Rouge. Thus, it is not a foregone conclusion that every potential member of the jury will have been exposed to the

---

[2] Of course, this matter has not yet gone to trial, and the Court cannot evaluate the jury's treatment of each defendant on each count. Nonetheless, as discussed herein, the Court can take into account results in other recent "police misconduct" cases tried in the Eastern District of Louisiana.

[3] A comprehensive, 116-question questionnaire was jointly prepared by all counsel herein, and approved by the Court. Potential members of the jury pool commenced filling out those questionnaires on May 2, 2011. The information contained in those questionnaires shall be provided to counsel to assist in jury voir dire, and are designed to address many of the concerns raised by the defendants in their motion to change venue.

"news" items described in the defendants' memorandum, particularly those printed in the New Orleans-based local newspaper.

Moreover, as the government points out, most of the media accounts relating to this matter contain statements and/or quotations from defense counsel conveying their client's position. This is particularly true involving coverage of federal guilty pleas in matters factually related, wherein defense counsel were sought out for a responsive quote, at a minimum.

Perhaps the best example of the ability of this Court to impanel a fair and impartial jury is the recent experience in other so-called "police misconduct" cases.[4] In a factually unrelated matter arising out of post-Katrina events in Algiers, wherein certain police personnel were indicted for excessive force and subsequent cover-up, the jury discerned that, based on the evidence presented, three of the officers were convicted on certain counts, and two were found not guilty. *See United States v. David Warren, et al.,* No. 10-154 "I" (Rec. Doc. No. 427-4). It seems clear that the jury in that case considered each and every count individually against each and every defendant individually, as is proper. The jury rendered a verdict that indicates some discernment and distinction between defendants and counts, such that the evidence was clearly considered, rather than painting all defendants with the broad brush of guilt.

In the most recent Eastern District of Louisiana "police misconduct" trial, two officers were alleged to have used excessive force against a man in or around July 2005, *i.e.,* before Katrina. The

---

[4] The Court also notes that other highly publicized criminal matters not involving police officers were recently tried in the Eastern District, where a jury was successfully seated: *United States v. Mose Jefferson,* No. 08-85 "S" (2), *United States v. Mark St. Pierre,* No. 09-374 "L" (5), and *United States v. Renee Gill Pratt,* No. 08-140 "B" (1). Each of these cases involved very extensive electronic and print media coverage in the metropolitan New Orleans area.

5

jury convicted both men, considering three counts over the course of a day and a half. *See United States v. Melvin Williams, et al,* No. 10-213 "L" (Rec. Doc. No. 97-4). That matter, largely contested on the grounds of expert testimony, was later the subject of an interview with the jury foreman. The jury foreman's comments indicated his impartiality and general support of police officers, as well as his emotional conclusion as to the guilt of each of those particular defendants based upon the evidence presented at the trial. *See* Attachment B to government's opposition (Rec. Doc. No. 350-1).

Although defendants submit to the Court the sheer number of mentions of the "Danziger bridge shooting" in response to an internet query, defendants fail to differentiate between statements which portray them in a more "positive" light versus those which portray them in a "negative" light, or which do neither and could be considered "neutral." For instance, the events out of which the federal indictment arose initially culminated in a dismissed state court indictment. It is important to note that the coverage following that dismissal included plaudits for these defendants for their heroism in helping to re-establish order amidst the chaotic days following Katrina. *See, e.g.,* Attachment C to government's opposition (Rec. Doc. No. 350).

Defendants additionally point to two other reasons which they argue warrant a change of venue. The first is the March 17, 2011 release by the United States Department of Justice of its comprehensive review of the NOPD policies and procedures. Nothing in that report, however, directly references this matter. And, although the report may reflect a number of troubling systemic issues existing within NOPD (including purported violation of citizens' Constitutional rights), it ostensibly pertains to the two years prior to its release, and is purposely geared toward prospective

changes to be undertaken within the NOPD.  Second, the defendants also cite a television program named "Treme", apparently set in post-Katrina New Orleans.  This show, however, is available only on a premium "pay" channel.[5]  In any event, other than asserting that "Danziger" was mentioned in the program this season by a lawyer character communicating with a police officer character, defendants offer no evidence of the following:  the subscription rate of cable TV homes in the parishes of the Eastern District of Louisiana for this premium channel; the viewer ratings of this particular program within either the metropolitan New Orleans area, or the entirety of the Eastern District of Louisiana; and how references to "Danziger" in the TV show are prejudicial to the defendants in this case.

The defendants' reliance on *Rideau* also is misplaced, in that the relative size of the respective communities involved more closely resembles the *Skilling* scenario.  Further, *Rideau* involved the publicity surrounding a purported confession by the defendant of the crime.  Finally, given that the events involved here occurred more than five and a half years ago, in the immediate aftermath of Hurricane Katrina, the trial herein will not "swiftly follow a widely reported crime." *See Skilling*, at 2916; *Rideau*, 373 U.S. at 724.

Finally, the Court acknowledges that, on the one hand, *all* police activity, including routine law enforcement as seen in the "police reports" section of local newspapers, is usually newsworthy. In addition, the activities of public employees, including law enforcement personnel, are regularly the subject of media coverage, and when fatalities are involved (as was the case on September 4, 2005), the event is even more newsworthy.  Thus, the Court cannot simply conclude that a quantity

---

[5]This premium channel is available for subscription nationally, thus also undercutting the notion that changing venue herein would necessarily eliminate the chance of a juror's exposure to such program.

7

of media coverage, regardless of its portrayal of such events, warrants a change of venue.[6] On the other hand, the Court is cognizant that this issue is a fluid one, in that further media coverage, if pejorative, between now and the June, 2011 trial date might indeed create circumstances such that a change of venue might be appropriate. In denying the defendants' motion today, the Court does so without prejudice to revisit this issue in the event the process of selecting the jury reveals complications of the sort the defendants describe in their memorandum in support. In other words, the Court's concern about publicly-disseminated prejudicial information sufficient to taint the jury pool for this trial remains constant, and will remain constant, up through the conclusion of this trial.

## CONCLUSION

For the reasons stated, the Court presently cannot find sufficient reason to warrant a change of venue for the trial of this matter. Accordingly, **IT IS ORDERED** that the Motion to Change Venue filed by defendants is **DENIED**. The undersigned and all counsel and parties, however, shall remain vigilant with regard to the impartiality of each person reporting for jury duty on June 20, 2011, to ensure that no one may reasonably question that this matter was tried to a fair, open-minded and impartial jury able to afford each defendant (on each count) the Constitutional presumption of innocence, and likewise hold the government to its burden of proving each element of each count against each defendant beyond a reasonable doubt.

New Orleans, Louisiana, this 20th day of May, 2011.

_____
**KURT D. ENGELHARDT**
**United States District Judge**

---

[6] Otherwise, the selection of jurors would merely be an exercise of looking "under rocks" or "in caves" for completely uninformed persons, totally disconnected from the communities in which they live.