UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS

KENNETH BOWEN                               NO.  10-204
ROBERT GISEVIUS
ROBERT FAULCON
ANTHONY VILLAVASO
ARTHUR KAUFMAN
GERARD DUGUE                                SECTION  "N"  (1)

## ORDER AND REASONS

Before the Court is the "Government's Motion to Reconsider Disclosure Order; Motion to

Exclude or Redact Documents from Disclosure; Motion to Put All Documents on the Record;

Motion for Protective Order" (Rec. Doc. 1194).  Primarily, the Government objects to the release

of certain documents, materials, and information, previously provided to the Court *ex parte*, to

Defendants[1] for purposes of addressing the Government's pending appeal of this Court's grant of a

new trial.  Defendants oppose the motion (see Rec. Doc. 1201) insofar as it seeks reconsideration

of the Court's November 1, 2013 disclosure order (Rec. Doc. 1179).  For the reasons stated herein,

and as specifically set forth hereinafter on pages 23-30, **IT IS ORDERED** that the Government's

motion is **GRANTED IN PART** and **DENIED IN PART**.

---

[1]        The term "Defendants," as used herein, refers to defendants Kenneth Bowen, Robert
Gisevius, Robert Faulcon, Anthony Villavaso and Arthur Kaufman, all former officers with the New Orleans
Police Department ("NOPD").

1

On September 17, 2013, this Court, citing several grounds, but purposely not *all* of the facts supporting such grounds, granted Defendants' motion for new trial (Rec. Doc. 963) without an evidentiary hearing.[2] That additional information was sealed and/or had been submitted ex parte, and in light of the Government's admissions in the "Horn Reports"[3] and accompanying documents, further discussion seemingly was unnecessary. (See September 17, 2013 Order and Reasons, Rec. Docs. 1137 and 1174-1.)[4] As set forth in the September 17th opinion, the Court relied upon certain information provided by Special Attorneys to the Attorney General John Horn and Charysse Alexander, as the result of their investigation of certain actions/omissions by various personnel employed by the United States Department of Justice ("DOJ"). The investigation included but was not limited to (1) the unresolved issue of the source of leaking of grand jury information in violation of Federal Rule of Criminal Procedure 6(e); and (2) the public posting of highly prejudicial and inflammatory comments (including abetting such activity), under anonymous names, by DOJ personnel, relative to both this case and other matters within the purview of the DOJ's prosecutorial mission. In the September 17, 2013 Order and Reasons, the Court cited to several passages of the Horn Reports and related documents, in addition to other troubling matters. The Court refrained from citing *all* material facts in the Horn Reports and materials, however, based on the belief that

---

[2]       See *Richardson v. United States,* 360 F.2d 366 (5th Cir. 1966); and *United States v. Chagra,* 735 F.2d 870 (5th Cir. 1984), as discussed at Rec. Doc. 1137, p. 120.

[3]       The "Horn Reports" consist of five submissions to the Court by Special Attorneys to the Attorney General John Horn and Charysse Alexander, bearing the dates of January 25, 2013, March 29, 2013, May 20, 2013, June 17, 2013 and June 25, 2013. See pages 13 through 31 of this Court's Order and Reasons dated September 17, 2013, identifying and partially describing each such report. Along with the Horn Reports, certain materials, such as transcripts and other documents, were requested by the Court for in camera review and thus are part and parcel of the material at issue herein.

[4]       Upon motion by the government, the September 17, 2013 Order and Reasons (Rec. Doc. 1137) was re-entered, for procedural reasons, on October 11, 2013. (See Rec. Docs. 1173, 1174 and 1174-1.)

a "critical mass" of admissions by the Government already had been reached, and, as such, that further disclosure of somewhat sensitive information was unnecessary. Thus, on the showing made, the Court ordered a new trial.

In filing its Notice of Appeal (Rec. Doc. 1175), the Government seeks appellate review of the Court's September 17, 2013 ruling, and the facts upon which it is based, thus placing such Government conduct at issue yet again. Despite its appeal, the Government continues to object, primarily on grounds of privilege, to providing certain portions of its submissions to Defendants and their counsel. In particular, the Government asserts the deliberative process[5] and work product privileges,[6] as well as a law enforcement privilege purportedly arising from the common law doctrine of executive privilege.[7] The Government also seeks to protect certain personnel information contained in specified electronic communications, and information set forth in particular materials involved in ongoing investigations by the DOJ's Office of Professional Responsibility ("OPR") investigations. Lastly, the Government has suggested language for a protective order limiting Defendants' use of all such information to the appeal and any further proceedings in this matter, and requiring the return/destruction of such material upon the conclusion of these proceedings. (See Rec. Doc. 1194, p. 22.)

---

[5]    See *Skelton v. U.S. Postal Service,* 678 F.2d 35, 38 (5th Cir. 1982).

[6]    See *United States v. Mann,* 61 F.3d 326, 331 (5th Cir. 1995).

[7]    See *In re U.S. Dept. of Homeland Sec.,* 459 F.3d 565, 569 (5th Cir. 2006).

## I.    PRELIMINARY POINTS OF ORDER

As a preliminary matter, the Court notes that the Government's motion evidences two fundamental misconceptions about this Court's September 17, 2013 Order and Reasons:  (1) that the undersigned's statements made in reliance on the limited information available at the time of the June 13, 2012 hearing on the motion for new trial can be relied upon today to support the present motion; and (2) that, in granting Defendants' motion for new trial, the Court relied *only* upon the information and documents cited in the September 17, 2013 Order and Reasons.[8]  On both accounts, the Government is incorrect.  Further, as will be explained herein, certain information not expressly referenced in the September 17, 2013 Order and Reasons is relevant to the Government's appeal of the Court's ruling, including whether a new trial is warranted on the materials previously submitted to the Court and/or whether the matter should be remanded for an evidentiary hearing.

### A.    The June 13, 2012 Hearing of Defendants' Motion for New Trial

This Court has, on two previous occasions (see Rec. Docs. 1070 and 1137), recited the events of the initial June 13, 2012 hearing, and the Court's thought process as of that time, based upon then existing information (or lack thereof).  On Page 10 of the motion sub judice, the Government recites a quote from the June 13, 2012 hearing, thus bringing the Court back in time when information about prosecutorial misconduct was sparse and the Court was inclined to believe that it might be rather

---

[8]    See Government's Motion to Reconsider Disclosure Order; Motion to Exclude or Redact Documents from Disclosure; Motion to Put All Documents on the Record; Motion for Protective Order (hereinafter referred to as the "Government's motion")(Rec. Doc. 1194), at page 23:  "Additionally, the Government asks this Court to exempt from disclosure those documents that do not relate to defendants' case or the motion for new trial, and on which the Court did not rely in its new-trial order."

limited.[9]  Of course, as the Government seems to acknowledge on Page 10, despite quoting the undersigned from the June 13, 2012 hearing, much has occurred since then.

Undoubtedly, the startling revelations that have slowly unfolded, most as a result of the pursuit of inquiry by this Court, have made the events and statements of June 13, 2012, pale in importance.  Indeed, that which seemed unhelpful to Defendants eighteen months ago now lends itself to Defendants' argument regarding prosecutorial misconduct.  In other words, on the showing made eighteen months ago, the Court discounted the need for Defendants to receive certain documents.  In the interim, however, that opinion has surely changed, in several respects, as a result of the Government's serial disclosure of more and greater misconduct, including that of former First Assistant United States Attorney ("AUSA") Jan Mann, DOJ Trial Attorney (and former Deputy Chief) Karla Dobinski, the Federal Bureau of Investigation ("FBI") Special Agent ("DOJ agency employee 'A'") referenced herein, and others, as set forth in the September 17, 2013 Order and Reasons and as further set forth herein. Thus, to be sure, the Government's current reliance on statements made on June 13, 2012 is rather dated.

**B.      The Court's Reasons for Granting a New Trial are Not Exhaustively Set Forth in its September 17, 2013 Order and Reasons**

In more than one place in its motion and reply memorandum, the Government asserts that the Court did not rely on certain information in its order granting a new trial.  (See Rec. Doc. 1194, pp. 9, 14 and 21; and Rec. Doc. 1217, pp. 2-3, and 9.)  In the September 17, 2013 Order and Reasons, however, the Court made clear that it considered the *entirety* of the Horn Reports and

---

[9]      At that time, only former Assistant United States Attorney ("AUSA") Sal Perricone's posting of comments on Nola.com was at issue; and even then, only those comments he posted for a short time as "Henry L. Mencken1951" were known.

5

related documents in determining that a new trial is warranted. Thus, the September 17, 2013 Order

and Reasons sets forth *only* those threshold matters deemed sufficient, in the Court's opinion, to

support and explain the decision to grant a new trial. The opinion is not, and was never intended to

be, exhaustive in that regard. And, were this matter to proceed to a new trial as ordered, there would

be no further need for disclosure of much of this information. The Government's decision to appeal

the Court's ruling, rather than proceeding directly to re-trial, however, renders the contrary true.

Most importantly, the Horn Reports, taken as a whole, are critical to the Court of Appeals'

review of this Court's decision, both because of what they include – and what they exclude. The

Horn Reports provide a significant degree of information as a result of Horn's investigation.

Undoubtedly, the previously described discourse between the Court and Horn (see Rec. Doc. 1137,

pp. 12-31) demonstrates that further investigation proved productive in finding a bit more of the

truth. Yet, as the Court indicated several times in its September 17, 2013 Order and Reasons, many

more questions that still abound, and are left unanswered, which likely could be solved with an

extensive evidentiary hearing. Nevertheless, as explained in the September 17th ruling, given the

substantial evidence before it (in the entirety of the Horn Reports and other materials submitted), the

Court, after much thought and consideration, concluded that a new trial was necessary, whereas an

evidentiary hearing was not, and instead would serve only to delay further proceedings.

Indeed, in granting Defendants' motion for new trial, the Court described the online

anonymous posting by DOJ employees as creating an "on-line 21[st] century carnival atmosphere"

(Rec. Doc. 1137, p. 65), a phrase which the Court applied on the basis of the jurisprudence set forth

by the Supreme Court in *Sheppard v. Maxwell*, 384 U.S. 333 (1966).[10]  Significantly, however, that description is inclusive of other conduct not mentioned in the Court's September 17, 2013 Order and Reasons (Rec. Doc. 1137).

In fact, at several junctures, the Court expressly chose not to include certain information in its September 17th opinion that it nonetheless considered quite important in reaching its decision. For instance, the Court referred to a New Orleans-based FBI Special Agent only as "DOJ agency employee 'A'",[11] rather than identifying the employee by name and as an FBI Special Agent. Furthermore, by means of email on August 21, 2013, Horn had notified the Court that, contrary to initial belief, the agent actually had served in a supervisory capacity over the "Danziger" investigation, at times directly supervising the matter, including reviewing and approving related documents, sometimes attending interviews of relevant persons, and assisting in the conduct of searches for evidence to utilize against the Defendants herein. And, significantly, the agent, utilizing one pseudonym on Nola.com, posted over 100 comments, at least four of which relate to this case. Although the agent's posts are critical of the *prosecution* during the trial of defendant Dugue, they nonetheless contribute to the Court's overall assessment and characterization of the Government's conduct as an "online carnival atmosphere."[12]

---

[10]    See *Sheppard*, 384 U.S. at 358: "The carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court." The Supreme Court, through Justice Clark, proceeded to highlight media publicity during the trial, the influence of such publicity on prospective witnesses, the release of "leads, information, and gossip" to the press by law enforcement, witnesses, and counsel, and the cooperation of the prosecution with news media outlets to disseminate otherwise would be impermissible at trial.  In this case, the "carnival atmosphere" on Nola.com occurred not only during trial, but extensively before and after (but still before sentencing) – outside of the courtroom and unbeknownst to the Court and counsel.

[11]    See Rec. Doc. 1137, pp. 16, 23, 30, 110, 121, and 124.

[12]    As stated hereinafter, the Court has determined that, given the Government's appeal, the identity of this individual must be provided to defense counsel.

Also not included in the September 17th opinion, and much more disturbing, is the testimony of Washington, D.C. Civil Rights Division Trial Attorney Karla Dobinski regarding her Nola.com postings during the 2011 trial in this matter,[13] specifically at approximately the 21:23 mark of her recorded statement that Horn and Alexander, upon request, provided to the Court. Deftly fending off her OIG[14] questioners and the need to answer with certitude, Dobinski related the following:

Q. (OIG Special Agent)     Were you sharing with other people that you were posting?

A. (Dobinski)     No. No. No.

Q.     Were you sharing with other DOJ officials that you were posting?

A.     That's - there was another attorney with whom I was - we were both watching these comments and watching the evolution of various posters. And I don't recall specifically if I mentioned to her that I had posted this. The "we" in this case definitely refers to me, you know, just ....

L. (Dobinski's Counsel)     The royal "we."

A.     The royal "we," but to answer your question of did I discuss with anyone else - there, I mean, I don't know how many people were following this, there was one attorney in the office who also took an interest in watching the evolution of some of the posters and I know I had a discussion with her.

Q.     Who is that attorney?

---

[13]     See September 17, 2013 Order and Reasons, Rec. Doc. 1137 and Rec. Doc. 1174-1, pp. 56-63, and 73-80.

[14]     Officer of Inspector General.

A.          Her name is Tona T-O-N-A Boyd B-O-Y-D.[15]

Q.          Okay. She's another attorney at Civil Rights?

A.          Yes.

Q.          Now was she involved in these ......

A.          No.

Q.          ...... cases? In any fashion?

A.          No. No, not at all. Just someone who frankly I think was watching it, you know, watching Bobbi [Bernstein] and being concerned about this case.

Q.          Uh-huh.

A.          It was a very prominent case in my office.

Q.          I see. Okay. So it sounds like Tona Boyd knew that you were posting?

A.          No. No. I'm not saying that. I'm saying I can't recall if I mentioned to her and it would have been either I'm thinking of, or I did in the sense of one time. It would not have been an ongoing "oh, I'm posting." No.

Q.          Okay. So you think you may have told her at one time .....

A.          Yeah.

---

[15]      Despite Dobinski's disclosure of fellow Civil Rights Division Attorney Tona Boyd as one who may well have had knowledge of Dobinski's posting, the Horn Reports do not mention Ms. Boyd, and thus do not reflect whether Ms. Boyd was ever interviewed about this, or what her testimony might be regarding the matter, including such important points as: (1) whether she was aware of anyone else, other than Dobinski, posting on Nola.com; (2) whether she (Boyd) reported Dobinski's posting to anyone else at DOJ; (3) if so, to whom; and (4) if not, why she believed she had no obligation or responsibility to report Dobinski's posting to superiors at DOJ, i.e. whether she too believed Dobinski's posting activity was innocuous and/or acceptable, common-place behavior. These inquiries are directly relevant to Defendants' argument that posting negative comments (or in Dobinski's case, encouraging such negative comments) was either orchestrated, encouraged or accepted behavior at the USAO and/or DOJ, and would further be the subject of the evidentiary hearing Defendants have sought from the beginning, if such a hearing were held.

Q.                             ...... to have posted something?

A.                             I can picture this conversation we are having - it wasn't focused on that, it was focused on the evolution of some of the posters. There were ..... there's kind of a community and there are some who you could see them change their mind through the trial of their opinions. And that was the discussion we were having.

L. (Dobinski's Counsel)        So just to make [inaudible], you recall there being conversation with Tona Boyd about other people that were posting on Nola.com?

A.                             Right.

L. (Dobinski's Counsel)        About the case?

A.                             About posters that we were reading online not - we didn't know of anyone else posting.

L. (Dobinski's Counsel)        Right.

A.                             Yeah.

L. (Dobinski's Counsel)        But what you don't recall is whether you mentioned to her that you occasionally posted something.

A.                             It wouldn't have been okay because it would have been like I might have said I asked them to say more or I want to ask them - that's what I can't remember.

Q.                             So you think you might have told Tona that you posted once?

A.                             Something like that, I mean it was definitely, you know, a very abbreviated reference to, you know, I wish these people who are in the courtroom would post more about what was going on.

L. (Dobinski's Counsel)        But that's different, telling Tona that you wished the people in the courtroom were posting more is different from telling her that you posted something, so what are you saying?

A.                I'm saying I either said something like I asked them to tell more or I want to ask them, that's what I can't remember the exact timing of that.

Q.                So if you said I asked them to tell more, then that would have been indicating to Tona that you posted a comment asking them to tell more?

A.                I guess so.

Q.                Okay.  All right.

L.  (Dobinski's Counsel)     You're not certain?

A.                You know, I just don't have - this is just isn't as crisp moment, you know, it was sort of - because that wasn't the focus of our conversation. Our conversation was more on people watching some of these posters and all.

Q.                Okay.  And did this conversation take place at your office?

A.                Yeah.

(Dobinski Recorded Testimony, 21:23-25:12.)  During her questioning by OIG investigators, Dobinski described herself as being "chagrined" at the revelation that she had posted on Nola.com as "Dipsos." *Id.* at 34:31.  Nevertheless, she continuously equivocated in answering several questions,[16] as can be seen in the oblique manner she answered (with suggestive interjections, qualifications, loopholes, and leading questions provided by her counsel) in this colloquy.

Further, in the September 17, 2013 Order and Reasons, the Court emphasized that, while admitting they each used at least one additional pseudonym to post comments in the past, neither Sal Perricone nor Jan Mann could recall those monikers in order to afford the Court, and Defendants,

---

[16]      For example, regarding her posted comments addressing each, Dobinski was asked separately if "crawdaddy" and "willuplease" are names of other Nola.com posters. Dobinski responded with one word: "apparently," as though she too was attempting to figure out, for the first time when interviewed in December 2012, to whom her posts were directed.

the opportunity to review that posting activity for potential Rule 6(e) violations and/or violations of 28 C.F.R. § 50.2, the United States Attorneys Manual, the Local Criminal Rules of the Eastern District of Louisiana, and the Rules of Professional Conduct. Like Perricone and Mann, Dobinski's testimony relative to whether she, as "Dipsos," had ever posted any additional comments to Nola.com, is equally vague, equivocal, and, as a result, unsatisfactory:

| | |
|---|---|
| Q. (OIG Special Agent) | Okay. Now you said that other than these postings that you brought in today, you don't recall posting other comments to Nola.com? |
| A. (Dobinski) | None at this time. I haven't, uh, with the press of time, gone through to double check, but this is the best of my knowledge of postings. |
| Q. | Okay. Rate your level of confidence in that because I understand memories fade, um, I think you indicated before we started the recorder that, you know, you're not a hundred per cent sure that there might not be other posts that we would find. |
| A. | I don't know how to rate that, just there's that, you know, I think I'm a pretty thorough person so for me I'd want to really have the time to double check. |
| Q. | Okay. |
| L. (Dobinski's Counsel) | The problem - one impediment to answering your question more confidently is that if one enters the word "Dipsos" onto the Nola.com website, you apparently can't conduct a search on that term that would yield hints of any other postings if there were any. Um, so the only other thing one could do might be to go through every article that appeared in Nola.com and review all the comments to see if there was any other - that would be a very time intensive endeavor. |
| Q. | Sure. But is it correct that um that you're not saying you're a hundred per cent sure there were no other postings. If we found additional postings, it is not going to contradict your position here today? |
| A. | Right. |

(Dobinski Recorded Testimony, 30:15-31:52.) Thus, the Court yet again is left with a trail that ends mysteriously, and a suggestion that other posts may have been made by her, but will never be known to the Court or Defendants and their counsel.

While the questions propounded by OIG during its 35-minute interview of Dobinski are helpful, they are not nearly exhaustive as to whether she, Tona Boyd, or others in DOJ knew about internet postings on other cases in the past; whether Dobinski had posted in the past, which seems quite plausible given her testimony; whether any such activity was tacitly approved and/or ignored by others in DOJ; and whether anyone questioned other attorneys at DOJ, particularly one (Boyd) who Dobinski identified as perhaps having had knowledge of her posts.

In addition, the transcripts of two OPR interviews (August 8, 2012 and November 15, 2012) of former First AUSA Jan Mann are rife with information upon which this Court relied in determining that a new trial herein is warranted. Citations to Mann's testimony in the September 17, 2013 Order and Reasons, however, are very sparing and selective, and by no means constitute the entirety substantially considered by the Court in reaching its conclusion. For instance, when questioned, Mann admitted that she posted thirteen times from work, during the work day, on a USAO/DOJ computer. (Testimony of Jan Mann, November 15, 2012, p. 23, l. 1-20.)[17] Moreover, the testimony of Mann, among others, is helpful in determining the truth and veracity of not only her statements, but the statements of others[18] who were either interviewed by Horn or submitted pre-

---

[17]    In addition to Jan Mann, it has been established that Perricone also made some Nola.com posts at issue herein during the workday; and Dobinski posted on Nola.com at least once during the workday, albeit while working from home on Friday, July 29, 2011, as this trial was about to enter its final week. (Dobinski Recorded Testimony, 27:45-29:25.)

[18]    When the initial news report of the March 13, 2012 lawsuit against Perricone was posted on the Nola.com web page, a former EDLA AUSA emailed then and current long-time AUSA Carter Guice concerning the allegations. The single-sentence response from AUSA Guice was appropriate and quite telling: "I hope everyone tells the truth." (Email from AUSA Carter Guice dated March 13, 2012 to a former

printed form affidavits in connection with his investigation.[19]

In addition, the "online carnival atmosphere" was marked by internecine criticisms against certain FBI agents, and vice versa. In the September 17th Order and Reasons, the Court set forth Perricone's longstanding criticisms of the FBI (Rec. Doc. 1137, pp. 99-101), as well as Perricone's and Mann's previous criticism of at least one specific FBI Special Agent who now is retired. (Testimony of Jan Mann, November 15, 2012, p. 72, l. 10 - p. 75, l. 2). See also Order and Reasons of November 26, 2012 (Rec. Doc. 1070), p. 16, fn. 20. These quotes are juxtaposed against the January 2012 posts criticizing the prosecution (specifically, prosecutor Bernstein) in this case made by the FBI Special Agent previously referred to only as "DOJ agency employee 'A'", who had supervisory responsibilities over the "Danziger" investigation.

Of further significance, Mann testified she thought discovery of her posting activity might warrant relinquishing her title and responsibilities as First AUSA for the EDLA, but, interestingly, did *not* believe it sufficient to jeopardize her status as a DOJ attorney. In discussing her disclosure

_____

EDLA AUSA.) (See Rec. Doc. 1144, Exhibit B-3, pp. 1-2, which shall be provided to defense counsel unredacted.) Though the Court hoped for the same, events transpiring since March 2012 have demonstrated the contrary.

[19]     Former First AUSA Jan Mann testified:

   A.      -- I kept telling him [USA Letten], "You know there's going to be other bloggers probably. *There's going to be other commenters in the office."  I mean, I would not ever say there's none. I don't know.*

        *I don't know to this day if there are, I couldn't tell you who they are, but I believe in my heart that there are, you know. Now that I realize that I did it, Sal did it, are we the only two? Probably not.*  Probably in every U.S. Attorney's Office there's a handful of people commenting. I just believe that now, in retrospect.

(emphasis added) (Jan Mann November 15, 2012 Transcript, p. 136, l. 21 - p. 137, l. 10.)

14

of her posting activity to then United States Attorney ("USA") Jim Letten in March 2012, Mann

stated:

> Q.    Given that he [Letten] asked you a couple of questions during this
>       conversation --
>
> A.    Yeah.
>
> Q.    -- is there any doubt in your mind that he heard you and understood what you
>       were saying to him?
>
> A.    Well, I know from after this that he says he doesn't remember it.
>
> Q.    And what do you think accounts for that?
>
> A.    He likes to put his head in the sand for bad things.  It's not -- and it's not a
>       knock on him.  It's one of the best qualities he has in a way.  And that's why
>       I was there normally, except now I'm involved.
>
>                                                                     \*   \*   \*
>
> He kind of doesn't want to know bad things sometimes.  Like he protects
> himself.
>
> And I think he might have been protecting himself, because, like, I did ask
> him if -- if I should resign my -- not -- I said, *"I'm not offering to resign as an*
> *AUSA,* but I will step down."
>
> Q.    Was that on --
>
> A.    I'm thinking -- yes.
>
> Q.    -- on March 13th?
>
> A.    Yes.  I think he will remember that.  I didn't ask him the other day if he
>       remembered that, because I remembered that after.
> Q.    When did you say that to him?
>
> A.    Like we stayed late that night, and I think at the end of the day I said, "Jim,
>       I'll understand if you want me to step down as" -- and I remember saying,
>       "not" -- *"I'm not quitting, but I'll step down as First Assistant and Criminal*
>       *Chief."*

> And he's like, "No.  If you step down, I'm stepping down."

Q.    Why were you offering to step down as --

A.    Because --

Q.    -- First Assistant and Criminal Chief?

A.    Because I had commented.

Q.    Was it because you commented or because the Perricone thing had blown up
      and it was a failure to supervise?

A.    No.

Q.    What were you -- why were you offering to step down?

A.    Why did I say that?

Q.    Yeah.

A.    Because I had commented too.

(Testimony of Jan Mann, November 15, 2012, p. 124, l. 14 - p. 125, l. 5; p. 126, l. 25 - p. 128, l. 14.)

Thus, the former First AUSA asserts her belief that commenting online about pending trials such as

this one would be accepted by DOJ and not disqualify one from serving as an AUSA, but simply

might be cause for relinquishment of supervisory duties.

Even at the time of her November 15, 2012 testimony, Mann, like Perricone, Dobinski, and

the DOJ positions espoused in the Horn Reports, despite the clear mandates of the Code of Federal

Regulations, the United States Attorneys Manual, and the Local Criminal Rules of Court for the

EDLA (see Rec. Doc. 1137, pp. 34-42), still found a lack of clarity with regard to the propriety of

her posting activity: "I think this would be a good Law Review article, because I'm still not positive

that I did anything wrong." (Testimony of Jan Mann, November 15, 2012, p. 271, l. 14-16.)[20] And,

relative to her failure to advise the DOJ OPR personnel interviewing her in August 2012 about her

posting activity, she provided a rather disconcerting assessment of her EDLA office personnel:

> Q.    I assume probably, as a supervisor, that you count on people telling you some
> things even if you haven't specifically asked them?[21]
>
> A.    Not really, no. No. Do I think any of these people out here are going to come
> tell me they were commenting? Absolutely not.
>
> Q.    No, no, no. Not on that issue --
>
> A.    On any issue.
>
> Q.    -- on any issue?

---

[20]    For instance, like Perricone, Jan Mann proclaimed that her posting activity was done in some "personal" capacity versus an "official" capacity. (Testimony of Jan Mann, November 15, 2012, pp. 37, 41, 42-60, 61, 107.) She testified:

> Q.    Between November 5th [2011] and March 2nd [2012], did you tell Jim Letten
> that you were making postings?
>
> A.    No.
>
> Q.    On no occasions?
>
> A.    No.
>
> Q.    Why not?
>
> A.    Again, I'm doing it in my personal capacity. If I tell Jim Letten, it's not my
> personal capacity anymore. I'm putting the -- the, you know, imprimatur of
> the official in it. I don't want that. I want to keep this private and personal.
> I don't want to get any officialness. If it becomes something that he's
> sanctioning, then it becomes official. So no.

(Testimony of Jan Mann, November 15, 2012, p. 107, l. 9-24.)

[21]    This logical question applies as well to the DOJ's oblique approach in disclosing Dobinski, initially described only as an "employee" in the DOJ Civil Rights Division, as "Dipsos." (see Rec. Doc. 1137, p. 110.)

A.    No.

Q.    No?

A.    No.  Something that they don't think is wrong, that they're just going to say, "In case anybody might" -- no, I don't think that at all.

(Testimony of Jan Mann, November 15, 2012, p. 281, l. 2-19.)  These quoted excerpts are but a few examples of material that the Court considered in granting Defendants' motion for new trial, but did not recite in the September 17, 2013 Order and Reasons.  In fact, the entirety of Jan Mann's testimony is highly material to the Government's appeal of this Court's ruling.

Further, portions of the Horn Reports and their accompanying documentation indicate even more curious preoccupation and interest by DOJ personnel in the comments posted on Nola.com. Some of these documents have already been produced to Defendants as a result of the Court's August 13, 2012 Order and Reasons (Sealed Rec. Doc. 1041).  Others referenced herein, however, have not.  See emails of August 30, 2011 (previously marked and produced to defense counsel as No. 9); July 26, 2011 (previously marked and produced to defense counsel as No. 11); July 8, 2011 (previously marked and produced to defense counsel as No. 12);  June 8, 2011 (previously marked and produced to defense counsel as No. 13);  May 9, 2011 (previously marked and produced to defense counsel as No. 14);  April 18, 2011 (previously marked and produced to defense counsel as No. 15);   April 13, 2011 (previously marked and produced to defense counsel as No. 18A); December 16, 2010 (previously marked and produced to defense counsel as No. 20); see also October 15, 2010 email (Rec. Doc. 1144, Attachment D11, p. 162) between former First AUSA Mann and former USA Letten, transmitting a comment copied from Nola.com regarding two Plaquemines Parish officials.

Additionally, on February 28, 2011, an email exchange occurred between an AUSA and an FBI Special Agent (not DOJ agency employee "A"), regarding "reader comments," and focusing on a Nola.com comment pertaining to a juror (obviously in a previous trial, as this one had yet to occur as of the date of the email).  See Rec. Doc. 1144, Attachment D11, pp. 166-67.  The same AUSA and another were involved in two email exchanges with other AUSA's on December 10, 2009, regarding a comment (". . . .Go Sal!!!!!") posted by Perricone/legacyusa under an article concerning *United States v. Mose Jefferson,* No. 08-85 (E.D. La.).  See Rec. Doc. 1144, Submission B-3.  These examples show a persistent (and purposeful?) monitoring of the Nola.com comments under articles about DOJ prosecutions (particularly this one), much in the same manner in which Karla Dobinski and Tona Boyd monitored the comments under articles about this trial.

The fascination of these DOJ employees, both here in New Orleans and in Washington, D.C., with Nola.com postings is curious, given that the comments, when not condemning the defendants, their attorneys, and NOPD, are frequently frivolous, jockular, espouse uninformed opinions, advance personal agendas, and are posted anonymously with no ability for the reader to verify the source of the information or credibility of the poster by the provision of a real name.  Indeed, although not nearly on par with the actual posting of comments by DOJ employees, the preoccupation of DOJ personnel with this internet posting activity under unaccountable pseudonyms causes one to question whether the etiology of this posting activity was merely the interest/amusement of DOJ personnel in reading the comments, or whether the particularly insightful comments anonymously posted by Perricone (and perhaps others) peaked the interest of other DOJ personnel to read, trade, and perhaps comment themselves upon other Nola.com comments to join in the "carnival," in the belief that they too were acting in some "personal" capacity while avoiding "officialness."

In other words, in handling this matter on appeal, defense counsel must be afforded the same opportunity as the Government[22] to consider the Horn Reports and related materials as a whole, in order to fully appreciate: (1) the many unanswered questions involving the possible extensive nature of who all were posting comments online about this case, these defendants, defense counsel, the defense strategy, the NOPD in general, etc.; (2) who at DOJ knew such comments were being posted; and (3) whether such comments were either sanctioned, accepted, or deliberately ignored at higher levels of the DOJ. One need only recall that the Government could not recover data/evidence consisting of the USAO internet portals (see Rec. Doc. 1137, p. 29) for a directly relevant time period (2010 through December 19, 2011), which was, unfortunately, unavailable, despite the Government's quite sophisticated investigatory techniques in other matters.  Moreover, even Perricone and  Mann admit (and Dobinski is uncertain regarding prior comments posted) that they previously used other fictitious names in posting comments in the past, but could not recall those names, and although such information is not available to the Court, the loss of it surely cannot provide a presumption of benign behavior.

Lest it still be unclear, these are but a few more examples – not the entirety, as much is still not known – that cause the Court to firmly believe that a new trial is warranted to preserve the institutional integrity of a fair, unprejudiced prosecution.

### C.    Appellate Review of Whether to Hold an Evidentiary Hearing

The disclosure ordered by the Court likewise is relevant to the question of whether (*if* the government prevails on appeal and this matter is remanded from the Court of Appeals) an

---

[22]    As reflected in the separate September 17, 2013 Order and Reasons, it is the Court's understanding that counsel of record herein for the government are privy to the reports and documentation provided to the Court by Horn and Alexander, and former First AUSA Mann.

evidentiary hearing should be held. Specifically, in their original motion, Defendants specifically requested an evidentiary hearing in connection with their motion for new trial. (See Memorandum in Support of Motion for New Trial, Rec. Doc. 963-1, pp. 18-20.) At several junctures[23] in its September 17, 2013 Order and Reasons, the Court indicated its strong inclination to have an evidentiary hearing, but did not, only because it believed sufficient grounds warranting a new trial exist in the established and uncontroverted record. Thus, in the interest of conserving judicial resources as well as those of the parties, and hoping to lay much of the investigatory efforts of the Court and Horn to rest, the Court determined that an evidentiary hearing was unnecessary and that the case should move forward to re-trial.

On appeal, however, the Government posits that the Court was in error in granting the motion for new trial, seeking an order vacating this Court's September 17, 2013 Order and Reasons. Were the Fifth Circuit to agree, it might well determine that an evidentiary hearing indeed should be held, as was this Court's initial inclination. Without having the entirety of the unredacted Horn Reports and other produced materials, to the extent ordered by the Court, however, Defendants would be in no position to argue the need for the evidentiary hearing that they have sought since filing their motion for new trial.

As the Court has previously stated, one need only review the Horn Reports – both in terms of what they include and what they do not – to see that obvious questions remain unanswered, and that further pursuit of testimony and other evidence likely would result in more material revelations confirming the aggressive online activity of DOJ personnel in causing this prosecution to become

---

[23]     See Rec. Doc. 1137, pp. 7, 19, 31, 55-56, 94, 118, 120-22 and 128.

a cause célèbre in this community, and in the DOJ.[24]  The same is true regarding the many opportunities over several years for at least seven jurors and key trial witnesses (as well as their families, friends and co-workers) to directly and repeatedly view such highly opinionated, vituperative and prejudicial material leading up to this trial.

The Government may further argue on appeal that, despite this astonishing online activity and the other matters cited by the Court in the September 17th Order and Reasons, Defendants suffered no prejudice and that the jury's verdict should be presumed pure.  Were it not already clear to the Court that a new trial should be granted herein, the Court discussed Defendants' entitlement to an evidentiary hearing in its September 17, 2013 Order and Reasons.  (See Rec. Doc. 1137, pp. 120-22.)  The Court also opined that, in this egregious instance, such rare circumstances likely dispense with Defendants' need to show prejudice.  (See Rec. Doc. 1137, p. 114.)

Moreover, given the substantial amounts of material information that was not known by the Court or counsel during the entirety of Defendants' trial,  if an evidentiary hearing were held, the same type of thorough, searching questions employed during the voir dire process – when impartiality cannot be simply assumed – would have to be asked of the jurors and key trial witnesses. Indeed, under the circumstances here, single, conclusory questions regarding jurors' and witnesses' ability to remain impartial, and witnesses' ability to speak the truth, would be even more inadequate than they undeniably are during jury selection.  For instance, these individuals would have to be asked whether they read particular news articles and/or the comments[25] to the articles on Nola.com

---

[24]    Even in the Washington, D.C. halls of the Civil Rights Division of DOJ, this trial "was a very prominent case in my office", according to Karla Dobinski.  (See Dobinski Transcript at 22:34.)

[25]    In any event, were the Court to hold an evidentiary hearing, at which jurors and key witnesses  could be questioned about the full extent of their exposure to the persistent long-time misconduct

during the long timespan pertinent here and, if so, how often; whether they read or were aware of the particular Nola.com postings at issue here; whether they can remember with certainty if they read or were aware of any of the postings at issue here; whether during times relevant they discussed the news articles or comments published on Nola.com even if they did not personally read them; whether they or anyone close to them ever posts or blogs online; and what their opinion is, if any, of persons who do post or blog online. Nor undoubtedly is this list exhaustive.

Again, because the existing record in this case seems to overwhelmingly support granting the motion for new trial, the Court dispensed with the need for an evidentiary hearing in order for Defendants to obtain relief to which they already seemed entitled, given these shocking developments of the last two years. The Court is prepared to retry this case such that an untainted verdict can be rendered by a jury seated after a fully-informed voir dire process. Nevertheless, Defendants may want to pursue their request for an evidentiary hearing with the Court of Appeal. And, if they do, they should be apprised of materials pertinent thereto that the Government previously provided to the Court.

## II.    THE GOVERNMENT'S SPECIFIC OBJECTIONS

The Court has carefully reviewed the Government's motion and the individual selected

---

displayed online, the Court, as a threshold matter, would have to first discern the full extent of all such posting activity (including identity of any additional posters) over several years such that jurors and key trial witnesses could be adequately examined and cross-examined about what they saw and read (if they even remember so many posts spanning over several years). This challenge likely would prove insurmountable given the lack of recollection of Perricone, Mann, and Dobinski of any previous posts they may have made that have not already been identified, previous names they may have used online, and the inability of the Government to recover computer data in the USAO during the time period directly relevant to these proceedings.

documents which the Government proposes to either withhold from production, or, if not allowed such withholding, to provide to Defendants in redacted, but sealed, form. In that regard, the Court rules as follows:

    A.    <u>Intra-Governmental Emails About This Case</u>

        1.    Attachment A-2 to Record Document 1143

**Granted in part and denied in part.** The Government's objection is denied relative to four documents contained in Exhibit 2, which must be turned over to defense counsel unredacted: (1) a two-page email exchange dated February 19, 2010, between James Letten, Bobbi Bernstein and others re: "press inquiry from Times Picayune on danziger";[26] (2) a one-page email exchange dated March 8, 2010, between William Bezak, Julia Evans, and others re: "Information from mary howell"; (3) a two-page email exchange dated March 8, 2010, between William Bezak, Julia Evans, and others re: "Information from mary howell"; and (4) a three-page email exchange dated March 8, 2010, between William  Bezak, Julia Evans, and others re: "Suggestion re: Leak" and "Information from mary howell." The Government's objection is otherwise granted to the extent that it seeks to disclose a redacted version of Attachment A-2 to Record Document 1143 in the form of Exhibit 2 attached to the Government's motion.

        2.    Attachment B-3 to Record Document 1143

**Granted.**   The Government shall produce a  redacted version of Attachment B-3 to Record Document 1143 in the form of Exhibit 3 submitted with its motion.

        3.    Submission D-3 to Record Document 1144

**Granted.**   The Government shall produce a redacted version of Submission D-3 to

---

[26]     The Court notes that this document is duplicative of Submission D-7 to Record Document 1144 to which the Government has withdrawn its objection. See Rec. Doc. 1217, p. 10.

Record Document 1144 in the form of Exhibit 4 attached to the Government's motion.

> 4.    Submission D-6 to Record Document 1144

**Granted in part and denied in part.** The Government's objection is granted in part and denied in part to the extent previously indicated herein regarding Attachments A-2 and B-3 to Record Document 1143.

> 5.    Submission D-7 to Record Document 1144

The Government has withdrawn its objection regarding this document (which also is included in Attachments A-2 and B-3 to Record Document 1143). See Rec. Doc. 1217, p. 10. Accordingly, it shall be disclosed to Defendants.

> B.    USAO Emails Relating to Internet Postings

> 1.    Attachments D-2 and E-2 to Record Document 1143

**Granted in part and denied in part.** The Government's objection is denied to the extent that the Government seeks to avoid disclosure of even a redacted version of these documents. The Government's objection is granted to the extent that it seeks to disclose redacted versions of Attachments D-2 and E-2 to Record Document 1143, in the form provided in Exhibits 5 and 6 attached to the Government's motion.[27]

> 2.    Submission D-11 to Record Document 1144

**Granted in part and denied in part.** The Government's objection is denied to the

---

[27]    Although the Government's objection is granted in part, the Court notes that it previously ordered that two documents contained in Exhibit 6 be produced without redaction to Defendants. See December 16, 2010 exchange between Laura Orth, Mike Magner, and others regarding "on Nola.com" (Sealed Rec. Doc. 1041, No. 20) and March 3, 2010 email exchange between Julia Evans and Edward Rivera regarding "more on Danziger" (Sealed Rec. Doc. 1041, No. 22).

extent that the Government seeks to avoid disclosure of even a redacted version of these documents. The objection likewise is denied relative to two documents contained in Exhibit 7, which must be turned over to defense counsel unredacted: (1) a one-page email exchange between James Letten and Jan Mann dated October 15, 2010, re: "DA Charles Ballay" (p. 152 of Submission D-11); and (2) a two-page email exchange between Daniel Friel and Lisa Horner dated February 28, 2011, re: "reader comments" (pp. 166-67 of Submission D-11). The Government's objection is otherwise granted to the extent that it seeks to disclose a redacted version of Submission D-11 to Record Document 1144, in the form of Exhibit 7 attached to the Government's motion.

3.    Submission B-3 to Record Document 1144

**Granted in part and denied in part.** The Government's objection is denied to the extent that the Government seeks to avoid disclosure of even a redacted version of these documents. The objection likewise is denied relative to three documents contained in Exhibit 8, which must be turned over to defense counsel unredacted: (1) a two-page email exchange between Carter Guice and a former AUSA dated March 13, 2012, re: "did u call" (unnumbered pp. 1-2 of Submission B-3); (2) a one-page email exchange between Daniel Friel and a former AUSA dated December 10, 2009 (unnumbered p. 13 of Submission B-3); and (3) a one-page email exchange between Andre Lagarde and Sandra Gutierrez dated December 10, 2009, re: "bb" (unnumbered p. 14 of Submission B-3). The Government's objection is otherwise granted to the extent that it seeks to disclose the redacted version of Submission B-3 to Record Document 1144 in the form of Exhibit 8 attached to the Government's motion.

C.    Catalogue of Comments by H.L. Mencken

1.    Attachment F-2 to Record Document 1143

**Granted.**  Attachment F-4 to Record Document 1143 (Rec. Doc. 1179-11), which is the redacted version of Attachment F-2 to Record Document 1143, may be disclosed in lieu of Attachment F-2.

D.    <u>Investigative Reports by FAUSA John Horn and EAUSA Charysse Alexander</u>

1.    The Production of Information by Horn/Alexander on May 15, 2013 (Submission I to Record Document 1144)

**Granted in part and denied in part.** The Government's objection is granted relative to the identity of the AUSA described on Page 19 of the Government's memorandum (Rec. Doc. 1194), but denied in all other respects.   Thus, the only redaction in Submission I to Record Document 1144 shall be the specific identity of the AUSA.

2.    The Fourth Supplemental Report of June 25, 2013 (Submission O to Record Document  1144)

**Granted in part and denied in part.**   The Government's objection is granted relative to the "findings letter" from OPR to "DOJ Agency Employee 'A'", which shall not be disclosed  to defense counsel. The objection is denied in all other respects.  Thus, the report shall be disclosed without redaction to defense counsel.

E.    Emails between the Court and Mr. Horn and Ms. Alexander (Submissions P, R,T and V to Record Document 1144)

**Denied.**  The emails shall be disclosed to defense counsel without redaction.

F.    Documents related to this Court's request for the Government to Submit Recommendations about what information should not be made public (Submission U to Record Document 1144)

**Granted in part and denied in part.** The Government's objection is granted relative to the identity of the referenced AUSA , but denied in all other respects.

G.    OPR and [Agency]-OPR documents attached to the Horn Reports

1.    Transcripts and audio files of interviews by DOJ-OPR
(Submissions I-1 and I-2a to Record Document 1144)

**Granted in part and denied in part.** The Government's objection is granted

regarding redaction of Lines 10-19 on page 33 of Jan Mann's August 8th OPR transcript, and

redaction of the same portion of the corresponding audio file. To the extent any additional redaction

is sought, the objection is otherwise denied.

2.    [Agency]-OPR investigative document relating to
"DOJ Agency Employee A"
(Submission O to Record Document 1144)

**Granted.**

## III.    THE GOVERNMENT'S REQUEST FOR A PROTECTIVE ORDER

The Government's request for a protective order is granted. As stated below, documents

disclosed to Defendants in accordance with the orders of the Court shall be produced with the

provided language for a protective order.

## IV.    CONCLUSION

In arguing before the Fifth Circuit Court of Appeals, defense counsel should be able to view

that which the Court viewed in formulating its opinion, both for what the Horn Reports include, and

particularly that which is omitted and/or overlooked and/or excluded. In the undersigned's opinion,

it would be virtually impossible for defense counsel to argue the Government's appeal before a panel

of the Fifth Circuit without having access to the materials upon which this Court's decision is based.

For these reasons, **IT IS ORDERED:**

1. The Government's motion seeking reconsideration of the Court's November 1, 2013

28

disclosure order (Rec. Doc. 1194) is **GRANTED** to the extent set forth herein.

2. The Government's motion to exclude or redact documents from disclosure is **GRANTED IN PART** and **DENIED IN PART**, as expressly stated herein on pages 23-28 of this Order and Reasons.

3. The Court's determination in this Order and Reasons that the Government may disclose redacted documents to Defendants is **WITHOUT PREJUDICE** to Defendants' right to later request, by motion and for good cause shown, that a document(s) be disclosed without redaction.

4. As stated above, the Government's motion for protective order is **GRANTED**. Accordingly, **IT IS ORDERED** that the materials that the Government produces in connection with the motion for new trial (including internal Government emails, OPR materials, [Agency]-OPR materials, and OIG materials, but excluding any material that the Government has agreed should be made public), shall remain the property of the United States. Upon conclusion of the appeal of (and any further proceedings in) this matter, all such material shall be destroyed. All copies held by the defense shall be preserved only so long as is necessary for further proceedings related to this case, after which they shall be returned to the United States or destroyed. The Court may require a certification as to the disposition of any such materials.

Defendants and their attorneys may use the materials subject to this order solely in connection with the defense of this case and the appeal, and for no other purpose and in connection with no other proceeding (specifically including, but not limited to, any civil case). Other than material that the parties cite in pleadings in this case, neither the material nor any of its content shall be disclosed, either directly or indirectly, to any person or entity other than Defendants, Defendants' counsel in this case, or persons assisting in the defense of this case.

5. The Government's motion seeking to have all documents that have been reviewed by the Court in considering Defendants' motion for new trial included in the record of this matter is hereby **DENIED**, except as stated herein and as is otherwise indicated in other orders of this Court.

6. Counsel are to promptly confer to determine which additional documents, consistent with the Court's orders, must be added to the record in this matter to ensure that it is complete. Additionally, on or before Monday, January 6, 2014, the parties are to submit to the Court a joint list of the additional documents, as well a copy of the documents for inclusion in the record. The documents are to be numbered and labeled consistent with the joint list and, if submitted *in globo*, must contain page or Bates numbers.

7. To further ensure that the record in this matter is complete, attached hereto are the Nola.com postings by "crawdaddy" and "123ac" referenced in the Court's September 17, 2013 Order and Reasons (Rec. Docs. 1137 and 1174-1).

New Orleans, Louisiana, this 12th day of December 2013.

**KURT D. ENGELHARDT**
**United States District Judge**